GARRETT B. PETTEWAY SR.,

      Plaintiff,

vs.                                   CASE NO. 3:07-cv-845-J-TEM

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

_____

## ORDER AND OPINION

This matter is before the Court on Plaintiff's complaint (Doc. #1), which seeks review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). Plaintiff filed his Memorandum in Opposition to the Commissioner's Decision (Doc. #15), and Defendant filed his Memorandum in Support of the Commissioner's Decision (Doc. #18).[1] Both parties have consented to the exercise of jurisdiction by a magistrate judge, and the case has been referred to the undersigned by an Order of Reference dated February 21, 2008 (Doc. #17). The Commissioner has filed the transcript of the underlying administrative record and proceedings.[2]

The Court has reviewed the record and has given it due consideration in its entirety, including arguments presented by the parties in their briefs and materials provided in the transcript of the underlying proceedings. Upon review of the record, the Court found the

---

[1]Hereafter, the Court will identify Plaintiff's brief as "P's Brief" and Defendant's brief as "D's Brief."

[2]Hereafter, the Court will identify the Transcript as "Tr." followed by the appropriate page number.

issues raised by Plaintiff were fully briefed and determined oral argument would not benefit the Court in making its determinations. Accordingly, the Court has decided the matter on the written record. For the reasons set out herein, the Commissioner's decision is **AFFIRMED**.

## I. Procedural History

Plaintiff Garrett B. Petteway Sr. filed an application for disability insurance benefits on August 1, 2002, alleging disability beginning August 16, 2000 (Tr. 50-64). Plaintiff's application was initially denied on December 27, 2002 (Tr. 27-28) and upon reconsideration on May 8, 2003 (Tr. 31-32). Thereafter, Plaintiff requested a hearing, which was held on November 2, 2004, before Administrative Law Judge Gerald Murray (Tr. 255-68). At the hearing, Plaintiff appeared and testified, as did vocational expert Paul Dolan. Following the hearing, the ALJ denied Plaintiff's application for DIB in a decision dated April 4, 2005 (Tr. 8-18). The Appeals Council ("AC") denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner (Tr. 4-6).

Thereafter, Plaintiff filed an action in federal court, and at the request of the Commissioner, the matter was remanded to the Appeals Council which ordered an ALJ to hold further proceedings (Tr. 283-84). A supplemental hearing was held on December 18, 2006, before ALJ Philemina M. Jones (the "ALJ"), who heard testimony of the Plaintiff; a medical expert, Dr. Rafael Fernandez, Jr., and Walter Todorowski (the "VE") (Tr. 342-76). The ALJ issued a decision on May 7, 2007, denying Plaintiff benefits (Tr. 269-80). Plaintiff now appeals the Commissioner's final decision.

## II. Standard of Review

A plaintiff is entitled to disability benefits under the Social Security Act when he or she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A).

The Commissioner has established a five-step sequential evaluation process for determining whether a plaintiff is disabled and therefore entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(i-v);[3] *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). Plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987). The scope of this Court's review is generally limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence. *See also Richardson v. Perales*, 402 U.S. 389, 390 (1971).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as more than a scintilla—*i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (*citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982)).

---

[3]All references made to 20 C.F.R. will be to the 2008 edition unless otherwise specified.

Where the Commissioner's decision is supported by substantial evidence, the Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560.

The Commissioner must apply the correct law and demonstrate that he has done so. While the Court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions. *Keeton v. Dep't of HHS*, 21 F.3d 1064, 1066 (11th Cir. 1994) (*citing Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). Therefore, in determining whether the Commissioner's decision is supported by substantial evidence, the reviewing court must not re-weigh the evidence, but must determine whether the record, as a whole, contains sufficient evidence to permit a reasonable mind to conclude that the plaintiff is not disabled. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

As in all Social Security disability cases, Plaintiff bears the ultimate burden of proving disability, and is responsible for furnishing or identifying medical and other evidence regarding his or her impairments. *Bowen*, 482 U.S. at 146 n.5; *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987); 42 U.S.C. § 423(d)(5) ("An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."). It is a plaintiff's burden to provide the

relevant medical and other evidence that he or she believes will prove they suffer from disabling physical or mental functional limitations.  20 C.F.R. § 404.704.

**III. Discussion**

*A. Factual Background*

Plaintiff Garrett B. Petteway Sr.  was born on November 1, 1961, and at the time of the second hearing was  forty-five years old (Tr. 387).   In his disability report, he listed deteriorating discs in this back, with muscle spasms and pain as the reason he was unable to work, alleging an onset date of August 16, 2000 (Tr. 56).   He indicated his past jobs were being a farm laborer and working in a lumber yard (Tr. 57).   He told a doctor in 2000 that he was a farmer who raised bulls (Tr. 169).

At the supplemental hearing, Plaintiff told the ALJ that he was a high school graduate, and that he was married with three children (Tr. 349).  Plaintiff testified that he had not worked since August 16, 2000 (Tr. 351).  Plaintiff stated that every time he tried to do something, his back would lock up with shooting pain and that his legs sometimes would give out and he would fall (Tr. 351).

Plaintiff testified that his wife drove him to the hearing, because it was too far for him to drive (Tr. 352).  Plaintiff also stated that he takes muscle relaxers that cause him to be drowsy for a couple of hours (Tr. 352).  He stated his condition has gotten worse, compared to 2003 (Tr. 353).  Plaintiff stated he has tried several medications for pain, including OxyContin, methadone, and Lortab (Tr. 354).  He described the pain as an eight on a ten-point scale, with ten being the highest threshold of pain (Tr. 355).  At the first hearing, Plaintiff described his pain as a six, on average, with medication (Tr. 261).

5

Plaintiff testified he could sit for a couple of hours, but would have to stand up and move around some during that period (Tr. 355). He estimated he could stand for about 30 minutes before his back would stiffen, and stated he could walk about one block (Tr. 356). Aside from muscle relaxants and pain medication, Plaintiff has tried ice on his back and also injections, which he stated might help for a couple of days (Tr. 357).

The medical records show that Plaintiff was seen on July 18, 2000, by Dr. Roberto J. Perez, and had complained of chest wall pain (Tr. 109). The doctor issued a letter that Plaintiff would be unable to work until August 2, 2000, or until his condition improved (Tr. 131). Plaintiff received prescriptions and was seen again by Dr. Perez on August 1, 2000, complaining of lower back pain (Tr. 108). On October 3, 2000, Dr. Perez, in a letter, stated that during the latter part of July 2000, Plaintiff was suffering from low back pain due to strain and muscle spasm (Tr. 107). Dr. Perez stated he could not give an opinion on whether Plaintiff was able to work because he had not seen him since July 2000 (Tr. 107).

Starting on August 16, 2000, Plaintiff was treated at Rehabilitation Medicine Associates in Gainesville, Fl., by Dr. Christian M. Leber and Dr. Jesse Lipnick for back pain and pleurisy (Tr. 174). He was given prescriptions for a Medrol dose pack and Ultram, and was referred to physical therapy for three weeks (Tr. 171). An X-ray of Plaintiff's lumbar spine showed no bony abnormalities, but a marked loss of lordosis (Tr. 171). Dr. Lipnick wrote a letter on September 19, 2000 that Plaintiff had been placed on light duty status (Tr. 167). Plaintiff returned to see Dr. Lipnick on October 2, 2000, indicating his medicines had not worked (Tr. 165). An MRI was ordered; bilateral paralumbar muscle rigidity was noted; and Plaintiff was prescribed OxyContin (Tr. 165).

The MRI found at L2/L3 there was a slight degenerative signal loss with a small, central disc protrusion without focal nerve root compression (Tr. 163). Also, at L5/S1 the disc was decreased in height with discogenic vertebral end plate bone marrow change (Tr. 163). And a centrally protruding disc which does not compress the thecal sac or adjacent nerve roots (Tr. 163). On October 25, 2000 Plaintiff reported that the pain was not relieved by the OxyContin and that he had stopped taking it (Tr. 162). Dr. Lipnick prescribed Neurontin and also referred Plaintiff for an epidural injection (Tr. 162, 223-27).

On November 22, 2000, Plaintiff reported that strength had returned to his legs, and numbness had left (Tr. 161). He also reported that the epidural injection was very helpful in managing pain (Tr. 161). Dr. Lipnick wrote that Plaintiff previously worked as a bull tamer, and would not be able to do that work in the future (Tr. 161).

Plaintiff reported again to Dr. Lipnick on September 12, 2001, and said he had pain in his right upper quadrant (Tr. 159). He also asked to resume taking OxyContin, stating it provided good pain control in the past (Tr. 159). On May 10, 2002, he again reported low back pain with radiation to legs (Tr. 154). He said he had not taken medication regularly because it did not help with his pain, but nevertheless asked for a refill of OxyContin because it helps manage pain (Tr. 154). Plaintiff returned to Rehabilitation Medicine on August 6, 2002, complaining of back pain and occasional numbness and locking of the legs which buckle (Tr. 152). He stated to Dr. Leber that he had not been taking the OxyContin or any other medication for pain because they do not help him (Tr. 152). He also said he had received an injection in June and it caused him to go to bed for several days and he did not want any more injections (Tr. 152). He was given a prescription for OxyContin and Zanaflex and received a surgical referral (Tr. 152).

In May 2002, Plaintiff advised Dr. Lipnick that he was not taking medication regularly, but requested a refill of OxyContin (which had not been refilled for eight months) (Tr. 245-46). He was referred for an epidural, which was administered June 28, 2002 (Tr. 244). Dr. J.D. Boon, IV reported that Plaintiff claimed pain as a 10/10 before the epidural, and a 4/10 afterward (Tr. 244). On August 6, 2002, however, Plaintiff reported to Dr. Leber that the epidural in June "got him down in bed for several days and he doesn't want any more injections" (Tr. 243). Plaintiff also said he had not "really taken the OxyContin" because it does not help (Tr. 243). Nonetheless, Plaintiff was given a prescription for OxyContin and Zanaflex and a surgical referral (Tr. 243).

Dr. Leber referred Plaintiff to Dr. Kipp W. Kennedy of The Orthopaedic Center, Gainesville, Florida. After reviewing the 2000 MRI and examining the Plaintiff on October 24, 2002, Dr. Kennedy stated he did not see evidence of neural compression as a problem. Dr. Kennedy advised Plaintiff that surgery (fusion of L5/S1) might have a 50 percent chance of improvement of symptoms and restoration of full function was unlikely (Tr. 136-37).

On December 16, 2002, Plaintiff advised Dr. Leber that he had continuing low back pain, and stated he had started on Avinza, but did not believe it helped anymore than the OxyContin, and that it made him sleepy and drowsy (Tr. 150). Plaintiff said the surgeon indicated that surgery only had a 50 percent chance of helping, and that he did not think surgery would be worth the trouble (Tr. 150). In a visit on January 31, 2003, Plaintiff told Dr. Leber that the Avinza was not helping and he believed OxyContin helped more and that he would like to go back to it (Tr. 149). Dr. Leber noted ambulation was intact but there was acute tenderness to palpation in the lumbar spine (Tr. 149).

8

In April 2003, Dr. Lipnick referred Plaintiff to Rehab Solutions for a functional capacity evaluation ("FCE") by Bruce Miller, a registered occupational therapist. Mr. Mueller used a Blankenship system reliability profile and found Plaintiff did not demonstrate any symptom/disability exaggeration behavior and had given good effort (Tr. 191–204). He concluded that Plaintiff is "able to work at the LIGHT Physical Demand Level for an 8 hour day" (Tr. 189-90). The results indicated Plaintiff could lift 20 pounds and avoid climbing ladders (Tr. 189-90). Mr. Mueller indicated Plaintiff could not return to his job as a farm worker because he lacked the physical abilities for that labor (Tr. 190).

On May 16, 2003, Plaintiff continued to complain of low-back pain and spasms, which were only minimally relieved by medication (Tr. 239). Plaintiff ambulated without an assistive device (Tr. 239). Dr. Leber discontinued OxyContin and prescribed Methadone and increased his dosage of Zanaflex (Tr. 240). Dr. Leber also ordered a new MRI (Tr. 240).

On July 5, 2003, Plaintiff underwent an MRI at the North Florida Regional Medical Center in Gainesville, Florida. The finding was that since a previous MRI in 2000, there "has been progression of the degenerative changes at L5/S1 with more extensive discogenic vertebral end plate bone morrow change. There is minimal disc protrusion or central spinal stenosis" (Tr. 211). There also was minimal degenerative change at L2/3 with "central disk protrusion without cauda equina compression" (Tr. 211). There was no finding of focal nerve root compression (Tr. 211).

On July 28, 2003, Plaintiff returned to Dr. Leber, reporting no relief through Methodone use (Tr. 235). Dr. Leber discontinued the Methodone and prescribed plaintiff

Lortab (Tr. 236). He also ordered evaluation for a spinal injection, even though prior injections did not provide Plaintiff relief (Tr. 236).

Dr. Leber submitted a physical residual functional capacity questionnaire to Plaintiff's representative on August 28, 2003, attaching Mr. Mueller's report (186-188). Dr. Leber diagnosed Plaintiff with lumbar degenerative disc disease and disc protrusion or herniation, and listed Plaintiff's prognosis as fair but possibly a permanent impairment (Tr. 186). Dr. Leber listed the clinical findings as "active spasms; limited lumbar range of motion" (Tr. 186). Dr. Leber further reported that narcotic medications caused Plaintiff drowsiness and cognitive impairment (Tr. 186). He further indicated that Plaintiff's pain and symptomology would frequently interfere with Plaintiff's attention and concentration, even when performing simple work tasks (Tr. 187). Dr. Leber stated Plaintiff likely would miss more than four days of work per month (Tr. 188).

On December 11, 2003, Plaintiff reported to Dr. Leber that he had been without medication since September, and that the Lortab had not worked (Tr. 233). He was referred for epidural injections and prescribed Skelaxin (Tr. 234). Plaintiff was also advised to start a walking regimen (Tr. 234).

Plaintiff returned to Dr. Leber on February 24, 2004, after receiving an epidural injection the day before (Tr. 231). He reported his pain as a 7/10 (Tr. 231). Plaintiff reported the Skelaxin had not helped, and that Lortab and Tizanidine seemed to have helped the most, with the Tizanidine helping him sleep (Tr. 231). Dr. Leber noted that Plaintiff did not show any apparent distress and ambulated with a steady gait, but was tender to palpation in the lumbar region (Tr. 232). Dr. Leber discontinued Skelaxin and prescribed Plaintiff Tizanidine (Tr. 232).

10

On April 27, 2004, Plaintiff returned to Dr. Leber complaining that his pain was 7/10 and that he had been unable to get out of bed the prior week after attempting to wash his car (Tr. 229). Dr. Leber prescribed Percocet and Ultracet along with Tizanidine (Tr. 230).

In addition to the treating doctor records, Plaintiff was examined by Dr. Robert A. Greenberg on December 13, 2002 (Tr. 138-40). Dr. Greenberg found decreased range of motion of the lumbar spine and decreased strength in Plaintiff's legs, measuring 4/5 (Tr. 139). No other motor sensory or reflex abnormalities were noted (Tr. 139). No ambulatory assistance device was needed (Tr. 139). There was positive straight leg raising pain bilaterally at 15 degrees (Tr. 139). Dr. Greenberg stated that because of the severe lumbar pain, probably secondary to acute herniated lumbar disc, Plaintiff may require surgery (Tr. 139). Dr. Greenberg stated he believed Plaintiff would be unable to perform work-related activities because of the pain (Tr. 139).

Dr. Harry L. Collins Jr. reviewed the medical records (including Dr. Greenberg's letter) on December 20, 2002, and completed a physical residual functional capacity assessment (Tr. 141-48). Dr. Collins concluded that the Plaintiff's symptoms were caused by a medically determinable impairment, but that the severity of the symptoms was more than expected and not consistent with other evidence in the records (Tr. 146). Dr. Collins indicated Plaintiff could occasionally lift 10 pounds, frequently less than 10 pounds, stand or walk at least two hours during an 8-hour workday and sit for six hours in an 8-hour workday (Tr. 142). Dr. Collins stated Plaintiff could occasionally climb, balance, stoop, kneel, crouch and crawl (Tr. 143), but indicated he was unable to perform any work because of back pain and disc problems (Tr. 148).

Dr. Eric C. Puestow, a reviewing doctor, completed a physical residual FCE on April 3, 2003, finding that Plaintiff could lift 10 pounds occasionally and less than 10 pounds frequently, stand or walk at least 2 to 3 hours in an 8-hour workday and sit about 6 hours in an 8-hour workday (Tr. 177-84). Plaintiff could not crouch or crawl, and could occasionally climb stairs, balance, stoop or kneel (Tr. 179). Dr. Puestow indicated disagreement with treating source statements, concluding the objective data was consistent with the ability to perform sedentary work (Tr. 183). Dr. Puestow indicated Plaintiff's symptoms were attributable to a medically determinable impairment, but that the severity was disproportionate to the expected severity based on the impairment (Tr. 182).

### B. Analysis

Plaintiff raises three issues directly on appeal. First, Plaintiff claims the ALJ erred by violating the Eleventh Circuit pain standard (P's Brief at 3). Second, Plaintiff claims the ALJ erred by rejecting Plaintiff's treating physician's opinion regarding Plaintiff's limitations in arriving at his residual functional capacity (P's Brief at 10, 13). Lastly, Plaintiff asserts the ALJ erred by not posing proper questions to the VE regarding limitations resulting from chronic pain (P's Brief at 14).

Defendant, however, asserts the ALJ's final decision is supported by substantial evidence (D's Brief at 4). More specifically, Defendant claims the ALJ properly considered and evaluated Plaintiff's subjective complaints of pain and properly addressed the opinions of Plaintiff's treating physicians (D's Brief at 5-16). Lastly, Defendant argues that the hypothetical questions posed to the VE were correctly based on the RFC determined by the ALJ, and that ALJ did not have to rely on the answer to a hypothetical question asked

by Plaintiff's counsel which the ALJ did not find was supported by the evidence of record (P's Brief at 16-18).

### 1.    Plaintiff's Subjective Complaints of Pain

Plaintiff argues the ALJ improperly rejected his complaints of pain without articulating sufficient reason(s) (P's Brief at 3).  A review of the ALJ's decision, however, reveals the ALJ did consider Plaintiff's testimony and properly articulated adequate reasons for finding Plaintiff's testimony regarding his pain and limitations was not entirely credible  (T. 30-31).

The Eleventh Circuit pain standard requires evidence of an underlying medical condition, and either objective medical evidence that confirms the severity of the alleged pain arising from that condition, or that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.  *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986).  After considering a claimant's complaints of pain, the ALJ may reject them as not credible, and that determination will be reviewed for substantial evidence.  *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992) (*citing Wilson v. Heckler*, 734 F.2d 513, 517 (11th Cir. 1984)); *see also Cartwright v. Heckler*, 735 F.2d 1289, 1290 (11th Cir. 1984) (finding the credibility of a claimant's testimony is the duty of the Commissioner).

Additionally, the Regulations state that when the medical signs or laboratory findings document a medically determinable impairment that could reasonably be expected to produce the pain alleged, the Commissioner must then evaluate the intensity and persistence of the pain to determine how it limits the claimant's capacity for work.  20 C.F.R. § 404.1529(c).  In evaluating the intensity and persistence of a claimant's pain, the ALJ shall consider all of the available evidence, including the claimant's statements, signs

and laboratory findings, and statements from treating and non-treating sources. 20 C.F.R. § 404.1529(c). As noted in *Landry,* whether objective medical impairments could reasonably give rise to the alleged pain is a question of fact for the Commissioner, "subject only to limited review in the courts to ensure that the finding is supported by substantial evidence." 782 F.2d at 1553.

Here, the ALJ noted that if a plaintiff's statements about the intensity, persistence or functionally limiting effects of their pain is not substantiated by objective medical evidence, she must make a finding on the credibility of the statements based on a consideration of the entire record (Tr. 276). In doing so, the ALJ considered the factors listed in 20 C.F.R. § 404.1529(c)(3); *see also Macia v. Bowen*, 829 F.2d 1009 (11th Cir. 1987).

The undersigned finds the ALJ did not "reject" Plaintiff's allegations, but determined that Plaintiff's subjective allegations were not entirely credible (Tr. 277). Specifically, the ALJ noted that the medical expert, Dr. Fernandez, Jr., who testified at the supplemental hearing, stated he would assume that anyone who had received OxyContin and steroid injections over a four-year period would likely be experiencing pain, but that pain levels are very subjective (Tr. 278, 364, 366-67). The expert concluded that based on the medical evidence and the FCE (showing Plaintiff could do light work) a pain level of eight was not supported by the evidence (Tr. 189, 278).

Examination of the record shows that Plaintiff presented to either Dr. Leber or Dr. Lipnick on 14 occasions between August 16, 2000, and April 27, 2004, for visits concerning his back (Tr. 229, 231, 233, 235, 239, 241, 242, 243, 245, 159, 160, 161, 162, 165). Plaintiff also attended physical therapy secessions on at least 13 occasions (Tr. 164).

14

Additionally, Plaintiff received epidural injections on several occasions. There were no hospitalizations or emergency room visits.[4] Plaintiff reported in May 2002 that he had not had a refill for OxyContin for eight months (Tr. 245). In August 2002, Plaintiff stated he had not taken OxyContin since May 2002 (Tr. 243).

The ALJ noted that the medical expert, Dr. Fernandez, Jr., who reviewed the record reported that Plaintiff could perform light work, and that Plaintiff's treating physicians also limited Plaintiff to light work and never restricted his activities (other than bending) (Tr. 278).[5] Those doctors prescribed OxyContin and other pain relief drugs to Plaintiff, even though Plaintiff reported that he did not always use them (Tr. 154, 230, 233-4, 243). Dr. Leber also counseled Plaintiff to begin a walking regimen because if he sat and did nothing his condition would worsen (Tr. 234). The medical expert, Dr. Fernandez, Jr., testified that a pain level of eight was not supported by the medical evidence (Tr. 278). No MRIs revealed, nor did any physicians find evidence of nerve root compression. The record supports the ALJ's finding that Plaintiff's alleged degree of pain was not disabling, when considered in light of all the evidence.

In *Allen v. Sullivan*, 880 F.2d 1200, 1203 (11th Cir. 1989), the Eleventh Circuit found that where the administrative law judge has specifically articulated at least three reasons

---

[4]Plaintiff did undergo a hernia operation in September 2004 (Tr. 247-54).

[5]Plaintiff's treating physician, Dr. Leber, placed him on light duty at the time of his first visit and never removed him from that status (Tr. 161, 164-65,166-67, 172). In addition, Dr. Leber approved the FCE conducted by occupational therapist Bruce A. Mueller on April 3, 2003, finding Plaintiff could perform light work (Tr. 189) and continued to refer to the FCE. In July 2003, Dr. Leber stated Plaintiff's wife had asked him to complete a form stating Plaintiff was unable to work, but Dr. Leber stated, "I feel the functional capacity exam that was performed on 4/3/03 would be adequate to state what his restrictions in any job would be" (Tr. 236). This functional exam reflects that Plaintiff is capable of performing light work (Tr. 190-204).

for rejecting the claimant's subjective complaints of pain, he properly discredited his testimony. As stated herein, the Court finds substantial evidence in the record supports the ALJ's credibility determination, when viewed in light of the other evidence of record.

Plaintiff also points to a letter sent to the Commissioner from the Florida Department of Education in support of his argument that the ALJ erred by not properly discounting his pain testimony (P's Brief at 7-8; see also Tr. 102-04). Said letter was written to the Commissioner by Eva H. Heape ("Ms. Heap"), a vocational consultant, wherein she states she was referring Plaintiff for Social Security benefits because her vocational services have been unsuccessful in returning Plaintiff to work (Tr. 102-04).

Although the ALJ did not mention this letter in her decision, this evidence would be considered as "other source" evidence and is not entitled to controlling weight. 20 CFR 404.1513 (d), SSR 06-03p, 2006 WL 2329939, *2. Moreover, such evidence is to be weighed, and the weight attributed to such opinions will vary according to the particular facts of each case. *Id.* at *4-5. Factors to be considered when weighing other source evidence are: (1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (4) how well the source explains the opinion; (5) whether the source has a specialty or area of expertise related to the individual's impairment(s); and (6) any other factors that tend to support or refute the opinion. *Id.*

Here, although Ms. Heape may have had a long vocational rehabilitation relationship with Plaintiff, the undersigned notes that Ms. Heape neither presented any evidence to support her opinion that Plaintiff is completely unable to perform any level of work activity,

nor did she explain the basis for her opinion (*see* Tr. 102).  Ms. Heape merely stated that she was referring Plaintiff to the Social Security Administration because the efforts of her organization were unsuccessful in returning Plaintiff to work (Tr. 102).

In view of the fact the ALJ relied on a substantial amount of medical evidence and medical expert testimony, as discussed *supra*, the undersigned finds the ALJ's failure to incorporate said letter into her analysis is harmless error.  The Seventh and the First circuits have addressed harmless error with their findings.  Specifically, in *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989), the court found no principle of administrative law or common sense requires remand in quest of a perfect opinion unless there is reason to believe the remand might lead to a different result.  In *Ward v. Commissioner* of Social Security, 211 F.3d 652, 656 (1st Cir. 2000), the court found that while an error of law by the ALJ may necessitate a remand, a remand is not essential if it will amount to no more than an empty exercise.

### 2.    Treating Physicians

As Plaintiff correctly notes, substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards*, 937 F.2d at 583; 20 C.F.R. § 404.1527(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).  An ALJ, however, may discount a treating physician's opinion or report regarding an inability to work

if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d at 583.

Plaintiff argues that the ALJ erred in not accepting the opinions of Dr. Leber and Dr. Greenberg with regard to how long Plaintiff could stand in a day and whether he could lift 20 pounds occasionally. Under the Regulations, light work requires the ability to lift and carry 20 pounds occasionally and up to 10 pounds frequently, sitting up to six hours of an eight-hour workday, and standing/walking six or more hours in an eight-hour work day. 20 CFR 404.1567(b); *see also* SSR 83-10, 1983 WL 31251, at *5 (S.S.A. Nov. 30, 1982). The ALJ determined Plaintiff could perform a significant range of light work and her questions to the VE did not limit the hours of standing or the lifting of up to 20 pounds occasionally.

Plaintiff points to residual functional capacity evaluations completed by Dr. Leber (Tr. 338-41) and Dr. Greenberg (Tr. 328-31) in January 2007 and submitted to the ALJ after the hearing. Dr. Leber (noting he had not seen the patient since 2004) checked Plaintiff could lift 10-15 pounds occasionally; Dr. Greenberg (who saw Plaintiff for a consulting examination December 31, 2002) checked the box for 1-5 pounds (Tr. 330). Each doctor indicated Plaintiff could sit or stand at will only one to two hours a day, five days per week (Tr. 329, 339). Either assessment would indicate an inability to work at the light level of exertion. In addition, reviewing consultative doctor, Dr. Eric C. Puestow, completed a physical residual functional capacity assessment April 3, 2003, stating Plaintiff could stand 2 to 3 hours in an eight-hour day and lift 10 pounds occasionally (Tr. 177-84).

There were other physical assessments in the record, however, including some from Plaintiff's treating physician, Dr. Leber, that the ALJ noted. Dr. Leber noted early in his treatment that Plaintiff was released to light work, although light duty was not available at

18

his prior job (Tr. 167-68).  In addition, Plaintiff was referred to Rehab Solutions for a functional capacity evaluation on April 3, 2003 (Tr. 190-204), and Bruce A. Mueller, a registered occupational therapist, concluded that Plaintiff could work at the light occupational level for an 8-hour day (Tr. 190-91).  Although an occupational therapist cannot establish the existence of a medically determinable impairment, they are considered an "other source" for showing the severity of an impairment and how it affects the individual's ability to function.  20 CFR 404.1513 (d),  SSR 06-03p, 2006 WL 2329939, *2.

April 9, 2003 Dr. Leber signed off on the aforementioned functional capacity evaluation and agreed with Mr. Mueller's work restrictions, and further indicated the assessed work restrictions could be used for the return to work process (Tr. 189).  The FCE stated Plaintiff could stand and walk "frequently" and had a leg lift capability of 20 pounds, and could work at a light work level classification (Tr. 189).

"Frequent" means occurring from one-third to two-thirds of the time.  Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.  Sitting may occur intermittently during the remaining time."  SSR 83-10, 1983 WL 31251, at *6.

Dr. Jesse A. Lipnick, a physician in the same office as Dr.Leber at Rehabilitation Medicine Associates, P.A. ("RMA"), stated on October 2, 2000, that Plaintiff had been on light duty status since August 16, 2000, and remained on it until taken off by RMA (Tr. 164).  Activity level estimates in RMA's files, dated August 16, 2000, and  October 2, 2000, stated Plaintiff could sit, stand and walk up to eight hours, and occasionally lift 10 to 20 pounds

(Tr. 166, 172). On February 24, 2004, Dr. Leber noted that Plaintiff remained on a light physical level since the April 2003 FCE and that on examination he had 5/5 strength in all four extremities (Tr. 231-32). Notably, Dr. Leber stated Plaintiff should continue efforts to obtain a different type of employment than farm work that would be consistent with the limitations listed in the April 2003 FCE (Tr. 232).

Further, Dr. Leber specifically denied a request from Plaintiff's wife in August 2003 that he sign a form indicating Plaintiff was unable to work, stating the April 2003 functional capacity exam adequately reflects "what his restrictions in any job would be" (Tr. 236).

The medical expert who reviewed the record and testified at the January 18, 2007, hearing, Dr. Rafael Fernandez Jr., stated he believed Plaintiff could work at the light duty level (Tr. 363).

The ALJ gave Dr. Leber's assessments some weight, while disagreeing with his comment that Plaintiff might be absent from work "more than four days per month" (Tr. 188, 278). The ALJ noted that the Plaintiff did not see the doctor four days a month (Tr. 278). Indeed, the medical records show that Plaintiff reported to the doctor on intervals of two months or more, and often stated he had not been using pain medication (Tr. 154, 230, 233-40, 243).

The ALJ stated she considered Dr. Greenberg's consultive medical report, but gave it little weight because the record of the doctor's physical examination show only some lumbar abnormalities, which was inconsistent with his conclusion that Plaintiff could not perform any work-related activities (Tr. 278).

Based on the medical evidence, the FCE, and the consistent reports of treating physicians, Dr. Leber and Dr. Lipnick, which indicate Plaintiff was released to light duty

work, there was substantial evidence for the ALJ to conclude Plaintiff could perform work at the light level of exertion (*see* Tr. 161, 164-65,166-67, 172).  There also was substantial evidence to support the ALJ's rejection of the opinion of Dr. Greenberg and the residual functional capacity evaluation of Dr. Leber, completed in 2007 (almost three years after those doctors had last seen Plaintiff).  To illustrate, Dr. Leber's opinion in the 2007 report was inconsistent with the FCE Dr. Leber signed his approval to back in April 2003 (*see* Tr. 189).  A treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory.  *Crawford v. Comm'r of Social Security,* 363 F.3d 1155, 1161 (11th Cir. 2004).

### 3.    Hypothetical Question Posed to the VE

Plaintiff finally argues that the ALJ erred in not posing a hypothetical question to the vocational expert that encompassed all of Plaintiff's impairments (P's Brief at 14-15).  Specifically, Plaintiff objects to the fact that the ALJ ignored the answer the VE gave to Plaintiff's representative's question concerning whether a person who experienced marked pain and a marked inability to concentrate without an unusual number of breaks would be able to perform any work.  To which, the VE replied in the negative (Tr. 375).

In this case, however, the ALJ made no finding that Plaintiff experienced marked pain or that he had a marked inability to concentrate without an unusual number of breaks.  The ALJ specifically rejected one opinion of treating physician Dr. Leber that Plaintiff might miss four or more days from work per month as being unsupported by the record (Tr. 278).  The only evidence in the record to suggest Plaintiff was experiencing marked pain and a marked inability to concentrate during the relevant time period was presented in documents

that were dated well after the relevant time period which Plaintiff requested at the hearing to submit subsequent to the hearing (Tr. 375-76).

The ALJ acknowledged receiving those documents but indicated no further hearing would be needed because they were signed and submitted in January 2007, well after the date last insured of December 31, 2003 (Tr. 275). One report was submitted to Plaintiff's counsel by Dr. Greenberg, a consulting physician who had seen Plaintiff on one occasion, December 13, 2002 (Tr. 138-40), and whose opinion the ALJ already had already rejected (Tr. 278). The second was from Dr. Leber, a treating physician who had last seen Plaintiff in 2004 (Tr. 233). As mentioned previously, Dr. Leber had cleared Plaintiff for light work throughout his more than three years of treatment (*see* Tr. 161, 164-65,166-67, 172). Thus, his 2007 report three years after he had last seen Plaintiff was inconsistent with the treating record which the ALJ carefully considered (Tr. 278).

An ALJ is not required to rely on answers given by the VE to a hypothetical question that includes unsupported opinions or allegations. *Graham v. Bowen*, 790 F.2d 1572, 1576 (11th Cir. 1986). Nor does an ALJ have to ask a hypothetical question about pain limitations that the ALJ found were not supported by the record. *See Crawford*, 363 F.3d at 1161.

### IV. Conclusion

Upon due consideration, the undersigned finds the decision of the Commissioner was decided according to proper legal standards and is supported by substantial evidence. As neither reversal nor remand is warranted in this case, and for the aforementioned reasons, the decision of the ALF is hereby **AFFIRMED** pursuant sentence four of 42 U.S.C.

Section 405(g).  The Clerk of the Court is directed to enter judgment consistent with this ruling and, thereafter, to close the file.   Each party shall bear its own fees and costs.

**DONE AND ORDERED** at Jacksonville, Florida, this_ 31st _day of March 2009.

Copies to all counsel of record

_Thomas E. Morris_
**THOMAS E. MORRIS**
United States Magistrate Judge